IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 12-cr-00012-PAB

UNITED STATES OF AMERICA,

       Plaintiff,

v.

1. YARON "RONI" LEVIN
2. LIAT "LEE" LEVIN
3. FRANCISCO GUEVARA
4. JOHN ALLEN DARBY
5. GOLDEN HAND MOVING LLC, MOVERS USA LLC

       Defendants.

---

**INDICTMENT**

**Title 18, United States Code, Section 1349 – Conspiracy to Commit Wire Fraud**

**Title 18, United States Code, Sections 1343 and 2 - Wire Fraud, Aiding and Abetting**

**Title 18, United States Code, Sections 1951 and 2 - Extortion, Aiding and Abetting**

**Title 49, United States Code, Section 80116 – Falsely Making a Bill of Lading, Aiding and Abetting**

**Title 18, United States Code, Section 659 – Theft from Interstate Shipment**

---

**INTRODUCTION**

The Grand Jury charges that:

At all times relevant to this indictment:

1.    Defendant MOVERS USA LLC, also known as ("a/k/a") A GOLDEN HAND MOVING LLC and GOLDEN HAND MOVING LLC, was a moving company with offices located in Denver, Colorado, engaged in the interstate transportation of household goods ("goods") for members of the public.

2.    WORLDWIDE VAN LINES was a moving company with offices located in Delray Beach, Florida, engaged in the interstate transportation of goods for members of the public.

3.    NEIGHBORS VAN LINES was a moving company with offices located in Pompano Beach, Florida, engaged in the interstate transportation of goods for members of the public.

4.    Defendant YARON LEVIN, a/k/a "Roni LEVIN", was a co-owner and chief executive officer of MOVERS USA. As co-owner and CEO, defendant YARON LEVIN ran the day-to-day operations of MOVERS USA.

5.  Defendant LIAT LEVIN, a/k/a "Lee LEVIN", "Lee LEVI", "Lee CHIMNY", "Lee LEV", "Lee HEMLINE", and "Lee HAMLIN" was a co-owner and office manager of MOVERS USA. As office manager, defendant LIAT LEVIN assisted in running the day-to-day operations of MOVERS USA.

6.  Defendant FRANCISCO GUEVARA was a driver and foreman for MOVERS USA/GOLDEN HAND.  As a driver and foreman, defendant GUEVARA participated in the loading of customers' goods and interacted directly with customers.

7.  Defendant JOHN ALLEN DARBY was a driver and foreman for MOVERS USA.  As a driver and foreman, defendant DARBY participated in the loading of customers' goods and interacted directly with customers.

8.  The Federal Motor Carrier Safety Administration ("FMCSA") is a regulatory agency within the United States Department of Transportation ("US-DOT") with responsibility for consumer protection and safety regulation within the interstate moving industry.  The FMCSA can impose civil penalties under Title 49 of the Code of Federal Regulations ("49 CFR") and under Title 49 of the United States Code ("49 USC").

3

9.  As used in this indictment, the term "goods" means the household furnishings, personal property, and other articles to be moved.  The term "shipper" means the customer and owner of the shipment or goods.  The term "carrier" is used to describe the moving company that transports the shipper's goods.  The term "broker" is used to describe the agent or middleman who gathers shipper information and provides it to carriers.  Brokers often sell "leads," a term used to describe shipper information being provided from the broker to the carrier.  The term "bill of lading" is used to describe the document that contains the terms and conditions of the contract between the shipper and the carrier, as further described in paragraph 24.

10.  It is the purpose of a household goods broker to facilitate a customer's move by serving as a middleman between the customer and moving companies offering services to the public.  Brokers provide information to the customer, contact carriers on the customer's behalf, and arrange for transportation of the customer's household goods through agreements with various household goods

4

movers.  Household goods brokers must state clearly in their advertising and communication with customers that they are brokers and not carriers and that the actual transportation of the customer's goods will be provided by a carrier.

11.  Household goods brokers cannot provide a customer with an estimate of charges for the transportation of their household goods unless there is a written agreement between the broker and the carrier. (49 CFR 375.409)

12.  If a carrier has a written agreement with a broker, the carrier must comply with all parts of the contract including the estimated cost.  If the carrier accepts a non-binding estimate from the broker, the carrier must relinquish possession of the customer's household goods upon receipt of 110% of the broker's original estimated cost. (49 CFR 375.407)

13.  If the broker or carrier is located within a fifty (50) mile radius of the location of the household goods, the law requires that the broker or carrier conduct an on-site survey of the goods in order to estimate the cost of the move, unless the shipper waives this requirement in

writing.  (49 CFR 375.401)

14.  If the broker or carrier is located beyond a fifty (50) mile radius of the location of the household goods, the broker or carrier may provide the estimate based upon customer-provided information, typically from a telephone call between the broker or carrier and the customer.  The law requires that, whether completed in person or by telephone, estimates must be reasonably accurate. (49 CFR 375.401)

15.  Estimates must be in writing and must clearly indicate whether the estimate is binding or non-binding. (49 CFR 375.401)

16.  Under the terms of a non-binding estimate, the shipper (customer) and the carrier (moving company) agree to set the final cost of the move based upon the weight of the shipment.  The actual weight of the shipment is unknown until after it has been loaded.  Typically, the moving van is weighed while empty and then weighed again after loading to determine the weight of the shipper's goods.  (49 CFR 375.401)

17.  FMCSA regulations allow parts of the customer's

contract to be left blank until the carrier can determine the weight of the shipment or the total amount and cost of packing material or services used under a non-binding contract.  All other parts of the contract, however, must be agreed upon in writing prior to any work being done. (49 CFR 375.501 and 49 CFR 375.505)

18.  Customers are entitled to be present when the truck weight is measured.  Carriers are required to provide copies of the weight verification documents ("weight tickets") to the customer for the empty moving truck and the loaded moving truck to verify the total weight of the household goods, if the customer so requests.  These weight receipts must be attached to the bill of lading.  The weight receipts must also clearly identify the date, time, carrier, and customer's name or reference number. (49 CFR 375.507 and 49 CFR 375.521)

19.  Under the terms of a non-binding estimate, whether issued by a broker or by a carrier, the carrier must deliver the shipment upon receipt of 110% of the estimated cost. (49 CFR 375.707)

20.  Under the terms of a binding agreement, the

shipper (customer) and the carrier (moving company) must both agree in writing to a fixed charge for all services prior to the start of any work. (49 CFR 375.403)

21.  Carriers may re-negotiate the contract with the customer if the carrier believes that, upon doing an on-site inspection, the weight of the actual shipment significantly exceeds the original estimate.  This negotiation must be done prior to any work being done and with the customer's full consent and knowledge.  If the original estimate was non-binding, the carrier must provide a new written non-binding estimate to the customer and attach any previous estimate or contract documents to this new estimate. (49 CFR 375.403, 49 CFR 375.405, and 49 CFR 375.409)

22.  FMCSA regulations prohibit changing a non-binding agreement into a binding agreement.  Title 49 of the Code of Federal regulations §§ 375.501(f), 375.401(h), and 375.403(a)(6) require both the household goods mover and the customer to mutually agree to any amendment to the shipping order before loading the shipment.

23.  Once the customer's household goods have been

loaded and the shipment is ready for transportation, the carrier must provide the customer with an itemized inventory and a bill of lading, including all of its attachments. (49 CFR 375.505)

24. The bill of lading must contain the terms and conditions of the contract. The carrier must furnish a partially complete copy of the bill of lading to the shipper before the vehicle leaves the residence at origin. The partially complete bill of lading must contain all relevant shipment information, except the actual shipment weight and any other information necessary to determine the final charges for all services performed. When completed, the bill of lading must contain:

   a. The name, address, and telephone number of the carrier providing transportation of the household goods;

   b. The name and address of any other carriers, if known, participating in the transportation of the household goods;

   c. The name, address, and telephone number of the carrier's office (or the office of the carrier's

agent) where the individual shipper can contact the carrier in relation to the transportation of the shipment.

d. The form of payment that will be honored at delivery;

e. The agreed date or period of time for pickup and delivery;

f. The actual date of pickup;

g. The company or carrier identification number of the vehicle(s) used to transport the household goods;

h. The terms and conditions for payment of the total charges including notice of any minimum charges;

i. The maximum amount the carrier will demand at the time of delivery;

j. A statement of the declared value of the shipment including the maximum amount of liability if the shipment is damaged, destroyed, or otherwise not delivered;

k. Evidence of insurance sold to or procured for the customer from an independent insurer including the amount of premium for such insurance; and, if not

10

provided elsewhere to the customer,

l. A copy of the binding or non-binding estimate, the order for service, and an itemized inventory.


### COUNT 1 - Conspiracy to Commit Wire Fraud

Paragraphs 1 through 24 of the Introduction section are realleged and incorporated as though fully set forth herein.

13. From in or around November 2007 and continuing through approximately November 2011, in the State and District of Colorado and elsewhere, the defendants YARON LEVIN, LIAT LEVIN, FRANSISCO GUEVARA, and JOHN ALLEN DARBY knowingly and willfully combined, conspired, and agreed with each other, and with persons known and unknown to the Grand Jury, to commit acts and offenses against the laws of the United States, that is: wire fraud, in violation of 18 U.S.C. § 1343.


### OBJECT OF THE CONSPIRACY

14. It was the object of the conspiracy for the defendants to devise and intend to devise a scheme to obtain money and property by means of false and fraudulent

pretenses, representations, and promises by luring customers into doing business with MOVERS USA/GOLDEN HAND by offering customers extremely low moving estimates, taking possession of customers' personal property, and then fraudulently inflating the price of the MOVERS USA/GOLDEN HAND transport of the customers' goods, and thereafter withholding delivery of their household goods until the customers paid the inflated price MOVERS USA/GOLDEN HAND claimed it was owed.

### MANNER AND MEANS OF THE CONSPIRACY

15.  As part of the scheme and in furtherance of the execution of the scheme, defendant MOVERS USA/GOLDEN HAND represented itself to the public as a reputable moving company.

16.  As part of the scheme and in furtherance of the execution of the scheme, defendants YARON LEVIN and LIAT LEVIN represented themselves to the public as reputable businesspeople offering interstate moving services through MOVERS USA/GOLDEN HAND.

17.  As part of the scheme and in furtherance of the execution of the scheme, defendants YARON LEVIN and LIAT

LEVIN created business cards, business stationery, and other documents and publications embossed with the logo and name of "MOVERS USA". These documents and papers also falsely included the term "Member BBB" and the logo of the Better Business Bureau as a measure designed to mislead customers.

18. As part of the scheme and in furtherance of the execution of the scheme, employees of WORLDWIDE VAN LINES, NEIGHBORS VAN LINES, and R&C RELOCATION and others known and unknown to the Grand Jury, posted advertisements on Internet websites offering discounted rates for moving services. While these companies actually served as brokers, they did not disclose their true business practices to customers. Instead, WORLDWIDE VAN LINES, NEIGHBORS VAN LINES, and R&C RELOCATION identified themselves to customers as carriers that would actually be providing transportation of the customers' household goods.

19. As part of the scheme and in furtherance of the execution of the scheme, defendants YARON LEVIN and LIAT LEVIN, along with others known and unknown, provided

extremely low moving estimates to customers to induce them to hire MOVERS USA/GOLDEN HAND to move their household goods. These estimates were conveyed by telephone, facsimile, and electronic mail ("e-mail").

20. As part of the scheme and in furtherance of the execution of the scheme, employees of WORLDWIDE VAN LINES, NEIGHBORS VAN LINES, and other moving companies named herein solicited customers; took customer inventories; provided customers with weight and price estimates; collected customer deposits, usually 10-20% of the cost of the move; and scheduled dates for loading of customer goods.

21. As part of the scheme and in furtherance of the execution of the scheme, customers were generally provided with a written estimate, usually sent via e-mail. This estimate was based upon the volume (in cubic feet) of the furniture which was then converted to weight at a rate of approximately seven pounds per cubic foot. This estimated weight was then multiplied by a cost per pound to arrive at an estimated cost for the shipment. This estimate would usually be provided as a "non-binding" estimate.

14

Information regarding the move was also forwarded to MOVERS USA/GOLDEN HAND via e-mail or facsimile, per instructions of MOVERS USA/GOLDEN HAND.

22. As part of the scheme and in furtherance of the execution of the scheme, once employees of WORLDWIDE VAN LINES, NEIGHBORS VAN LINES, or other companies named herein had obtained the customer's information and collected the deposit, the "job" would be sold to MOVERS USA/GOLDEN HAND. WORLDWIDE VAN LINES, NEIGHBORS VAN LINES, and other brokers would keep the deposit as their payment for these jobs or "leads".

23. As part of the scheme and in furtherance of the execution of the scheme, defendants YARON LEVIN, LIAT LEVIN, FRANCISCO GUEVARA, and JOHN ALLEN DARBY provided incomplete or misleading information to victims. By determining the exact time and date the victim customer had scheduled to leave a residence, made travel arrangements, scheduled cleaning services, or had utilities turned off, defendants YARON LEVIN, LIAT LEVIN, FRANCISCO GUEVARA, and JOHN ALLEN DARBY used this information against the victim customer by purposefully delaying the move in order to

15

cause additional stress by providing false information to the victim customer regarding truck or equipment availability, scheduling delays, or other delaying tactics.

24. As part of the scheme and in furtherance of the execution of the scheme, defendants YARON LEVIN, LIAT LEVIN, FRANCISCO GUEVARA, and JOHN ALLEN DARBY intentionally delayed arrival for several hours or even days, thus forcing their victim customers to either cancel travel plans or, as is most often the case, to have a friend or family member stay behind to meet the movers. In these cases, when a friend or family member was standing in for the customer, YARON LEVIN, LIAT LEVIN, FRANCISCO GUEVARA, and JOHN ALLEN DARBY took advantage of the situation by having the friend or relative unfamiliar with the details of the move "re-negotiate" the original estimate, often for several times the original price. These "re-negotiated" contracts were then used to extract additional monies from victims.

25. As part of the scheme and in furtherance of the execution of the scheme, defendants YARON LEVIN and LIAT

LEVIN supervised the MOVERS USA/GOLDEN HAND drivers and employees assigned to handle the moves, including defendants FRANCISCO GUEVARA, JOHN ALLEN DARBY, and other drivers and employees.  FRANCISCO GUEVARA, JOHN ALLEN DARBY, and other drivers and employees of MOVERS USA/GOLDEN HAND, under the direction of YARON LEVIN and LIAT LEVIN, rushed customers through the MOVERS USA/GOLDEN HAND paperwork, causing them to sign blank or incomplete Bills of Lading and other documents, intentionally withheld required documents, and failed to inform customers of the actual price of the move prior to loading their goods.

26.  As part of the scheme and in furtherance of the execution of the scheme, MOVERS USA/GOLDEN HAND employees, acting under the direction of YARON LEVIN and LIAT LEVIN, ignored the customer's original non-binding estimate and replaced it with a binding estimate at a significantly inflated cost over the original estimate at the time the goods were loaded.

27.  As part of the scheme and in furtherance of the execution of the scheme, defendants YARON LEVIN, FRANSISCO GUEVARA, JOHN ALLEN DARBY, and others known and unknown

17

acting under the direction or YARON and LIAT LEVIN, caused customers to sign documents entitled "Revision of Estimate" in order to move their goods. This form, when fully executed and completed, authorized MOVERS USA/GOLDEN HAND to rescind the original estimate and give a new estimate under the guise of "changed circumstances." Although the form, on its face, could have been used for legitimate changes requested by shippers, MOVERS USA/GOLDEN HAND used the document to defraud victim customers who did not request additional services or changes to their moves.

28. As part of the scheme and in furtherance of the execution of the scheme, defendants FRANCISCO GUEVARA and JOHN ALLEN DARBY, acting under the direction of YARON LEVIN, LIAT LEVIN, and others known and unknown, inflated the cost of the move by adding packing materials, long carry fees, stairway fees, or other added costs. FRANCISCO GUEVARA and JOHN ALLEN DARBY personally received 15% of any additional costs they could add to the customer's total cost for the move. Defendant YARON LEVIN inflated the total price of the move by claiming that the customer's goods weighed more than had been quoted.

18

29. As part of the scheme and in furtherance of the execution of the scheme, the new binding estimate provided by YARON LEVIN had the appearance of having been negotiated prior to loading customers' goods, but it was left blank until YARON LEVIN, FRANCISCO GUEVARA, JOHN ALLEN DARBY, or other MOVER USA/GOLDEN HAND employees could determine the actual weight of the shipment.

30. As part of the scheme and in furtherance of the execution of the scheme, by changing the estimate to a binding estimate, YARON LEVIN effectively blocked the FMCSA from investigating consumer complaints against MOVERS USA/GOLDEN HAND and prevented customers from exercising the provisions of the non-binding estimate to have the goods delivered for 110% of the estimated cost.

31. As part of the scheme and in furtherance of the execution of the scheme, defendants YARON LEVIN, FRANCISCO GUEVARA or JOHN ALLEN DARBY, used and re-used photocopies of previously obtained weight tickets as proof of the empty weight of a moving van on or about the following dates:

| Date | Details | Weight Ticket |
|------|---------|---------------|
| 04/01 /2011 | Move from Aurora, CO to Worcester, MA | Cat Scale – Ticket Number 74367109, dated 02/07/2011 |
| 04/29 /2011 | Move from Dacono, CO to Newport News, VA | Cat Scale – Ticket Number 74367109, dated 02/07/2011 |
| 05/24 /2011 | Move from Littleton, CO to Deerfield Beach, FL | Cat Scale Ticket Number 74637109 dated 02/07/2011 |
| 05/27 /2011 | Move from Littleton, CO to Brookfield, IL | Cat Scale Ticket Number 74637109 dated 02/07/2011 |
| 05/28 /2011 | Move from Denver, CO to Cohecton, NY | Cat Scale Ticket Number 74637109 dated 02/07/2011 |
| 05/31 /2011 | Move from Kenosha, WI to Havertown, PA | Cat Scale Ticket Number 74637109 dated 02/07/2011 |
| 06/01 /2011 | Move from Grand Junction, CO to Scranton, PA | Cat Scale Ticket Number 74637109 dated 02/07/2011 |
| 06/11 /2011 | Move from Colorado Springs, CO to Lansing, MI | Diamond Shamrock Ticket Number 38509 dated 06/04/2011 |
| 06/19 /2011 | Move from Denver, CO to Los Angeles, CA | Diamond Shamrock Ticket Number 38509 dated 06/04/2011 |
| 07/06 /2011 | Move from Colorado Springs, CO to Olympia, WA | Diamond Shamrock Ticket Number 38509 dated 06/04/2011 |
| 07/08 /2011 | Move from Englewood, CO to Charlotte, NC | Diamond Shamrock Ticket Number 38509 dated 06/04/2011 |
| 07/16 /2011 | Move from Denver, CO to Marion, IA | Diamond Shamrock Ticket Number 38509 dated 06/04/2011 |
| 08/02 /2011 | Move from Colorado to Virginia | Diamond Shamrock Ticket Number 38509 dated 06/04/2011 |

| Date | Details | Weight Ticket |
|------|---------|---------------|
| 08/19 /2011 | Move from Littleton, CO to Springville, UT | Diamond Shamrock Ticket Number 38509 dated 06/04/2011 |
| 08/22 /2011 | Move from Colorado Springs, CO to Paducah, KY | Cat Scale Ticket Number 74637109 dated 02/07/2011 |

32.  As part of the scheme and in furtherance of the execution of the scheme, when contacted by customers requesting the delivery of their household goods, defendants YARON LEVIN and LIAT LEVIN demanded full payment of the new, inflated price before MOVERS USA/GOLDEN HAND would deliver goods.

33.  As part of the scheme and in furtherance of the execution of the scheme, thereafter, defendants YARON LEVIN, LIAT LEVIN, FRANCISCO GUEVARA, and JOHN ALLEN DARBY ignored repeated customer complaints about the inflated prices.

34.  As part of the scheme and in furtherance of the execution of the scheme, when customers refused to pay the inflated price, defendants YARON LEVIN, LIAT LEVIN, FRANCISCO GUEVARA, JOHN ALLEN DARBY, and other MOVERS USA/GOLDEN HAND employees known and unknown, arranged to

warehouse victim customers' household goods and refused to divulge the location of the goods to customers or provided false information regarding the whereabouts of the household goods.

35. As part of the scheme and in furtherance of the execution of the scheme, when delivering customer household goods, FRANCISCO GUEVARA, JOHN ALLEN DARBY, and other drivers and employees representing MOVERS USA/GOLDEN HAND and acting under the direction of defendants YARON LEVIN and LIAT LEVIN, demanded that customers pay any outstanding balance before they would unload, or even provide access to, the customers' household goods.

36. As part of the scheme and in furtherance of the execution of the scheme, defendants YARON LEVIN and LIAT LEVIN refused to adequately compensate customers for any damaged or undelivered household goods.

37. As part of the scheme and in furtherance of the execution of the scheme, the extremely low bid price, the drivers rushing customers through paperwork, the increase in price after taking possession of customers' household

goods, and the refusal to release said household goods, unless the customer paid the increased price, were all coordinated parts of the conspiracy designed to work together to extort maximum money from the customers.  There was interdependence among the members of the conspiracy; that is, the members, in some way or manner, intended to act together for their shared mutual benefit within the scope of the conspiracy charged.

38.  As part of the scheme and in furtherance of the execution of the scheme, defendant YARON LEVIN caused customer-victim K.C. and defendant JOHN ALLEN DARBY to make materially false and misleading statements to agents of the Federal Bureau of Investigation (FBI) and the U.S. Department of Transportation, Office of Inspector General.

## OVERT ACTS

In furtherance of the conspiracy and to effect its objects, at least one of the conspirators committed at least one of the following acts, in the State and District of Colorado and elsewhere:

### Victim 1 – V.S. (Colorado to Virginia)

39.  On July 19, 2011, WORLDWIDE VAN LINES, at the

direction of MOVERS USA, sent a facsimile message containing information regarding V.S.'s contract to YARON and LIAT LEVIN at MOVERS USA.

40. LIAT LEVIN, in furtherance of the scheme, placed a telephone call to V.S. on the afternoon of August 1, 2011, to advise V.S. that the truck would be late. During this telephone call, LIAT LEVIN identified herself only as "the movers" and not MOVERS USA or WORLDWIDE VAN LINES.

41. YARON LEVIN, acting upon information gathered by WORLDWIDE VAN LINES regarding V.S.'s travel plans and, with knowledge that she held airline tickets for August 2, 2011, intentionally delayed arrival of the moving truck to pick up the goods until mid-day on August 2, 2011.

42. YARON LEVIN arranged a pick up date knowing that V.S. would be unavailable.

43. LIAT LEVIN placed a telephone call to V.S. which led V.S. to believe that the movers had picked up her goods and that they were now on their way to Virginia as an interstate shipment.

44. Defendant FRANCISCO GUEVARA caused V.S.'s relative to sign an incomplete Bill of Lading. Defendant FRANCISCO

GUEVARA did not provide a copy of the bill of lading, order for service, or inventory to V.S. or to her relative when the goods were picked up.

45. Defendant FRANCISCO GUEVARA, acting upon instructions given by YARON and LIAT LEVIN, caused V.S.'s relative to sign additional incomplete shipping documents. One of the documents the relative was directed to sign was entitled "Revised Written Estimate".

46. Defendant FRANCISCO GUEVARA used a falsified weight ticket as proof of the empty weight of the moving van used to carry V.S.'s household goods. This falsified weight ticket was used to calculate the weight of the shipment and the overall cost of the move. The falsified weight was incorporated into the final bill of lading.

47. On or about August, 3, 2011, YARON LEVIN telephoned V.S. to inform her that her original non-binding contract with WORLDWIDE VAN LINES for a move from Colorado to Virginia at a rate of $3,275.95 was now void because the volume or weight of goods was greater than anticipated. YARON LEVIN converted the original non-binding agreement into a binding agreement worth $9,480.42—an increase of

25

289%.  YARON LEVIN would identify himself only as "the moving company" and refused to reveal his name, the name of his company, or the location of V.S.'s household goods.

48.  On or about August 4, 2011, V.S. received a telephone call from YARON LEVIN who finally identified himself and the name of his company.  YARON LEVIN told V.S. that her contract with WORLDWIDE VAN LINES was no longer valid and that he had written a new contract.

49.  Defendant YARON LEVIN sent V.S. a copy of the bill of lading for the shipment via electronic mail ("e-mail").

50.  Defendant YARON LEVIN told V.S. that he had no intention of transporting her household goods to Virginia, that he had moved her goods to his warehouse (a distance of approximately three miles from its point of origin), and that she now had to pay approximately $3,850 in order to have her goods released back to her so that she could move her goods to Virginia herself.

51.  From August 4, 2011, until November 15, 2011, YARON LEVIN refused to release household goods belonging to V.S. and continued to increase overall the cost of the move

through compounded storage fees, late payment fees, and other charges.

52. From approximately August 5, 2011, until at least October 28, 2011, defendant YARON LEVIN made repeated threats to cause harm to V.S.'s property; specifically, YARON LEVIN made telephonic threats to V.S. by claiming that he was about to sell the property at auction, if she did not immediately pay the inflated costs.

53. On or about November 16, 2011, defendant YARON LEVIN demanded an additional cash payment of $4,465 to have V.S.'s household goods released back to her.

## Victim 2 – W.B. (Colorado to Kentucky)

54. On August 9, 2011, WORLDWIDE VAN LINES, acting upon instructions from MOVERS USA, sent a facsimile message containing information regarding W.B.'s contract to YARON LEVIN and LIAT LEVIN at MOVERS USA.

55. On August 22, 2011, defendant YARON LEVIN caused W.B. to sign an incomplete bill of lading. Defendant YARON LEVIN inflated the cost of packing material and services by $441.

27

56.  Defendant YARON LEVIN caused W.B. to sign additional incomplete shipping documents.  One of the documents W.B. was directed to sign was entitled "Revised Written Estimate".

57.  Defendant YARON LEVIN told W.B. that his original non-binding contract with WORLDWIDE VAN LINES for a move from Colorado to Kentucky at a rate of $1,420 was now void because the volume or weight of goods was greater than anticipated.   LEVIN converted the original non-binding agreement into a binding agreement worth $5,115.86—an increase of 360%.

58.  Defendant YARON LEVIN used a falsified weight ticket as proof of the empty weight of the moving van used to transport W.B.'s household goods.  This falsified weight ticket was used to calculate the weight of the shipment and the overall cost of the move.  The falsified weight was incorporated into the final bill of lading.

59.  On or about August 24, 2011, defendant YARON LEVIN demanded an additional payment of $3,600 via electronic payment to have W.B.'s goods moved to Kentucky.

60.  On or about August 27, 2011, defendant YARON LEVIN

demanded an additional cash payment of $1,515 before LEVIN would release W.B.'s goods at delivery.

### Victim 3 – R.D. (Colorado to Nevada)

61. On or about August 30, 2010, R&C RELOCATOION, at the direction of GOLDEN HAND, sent a facsimile message containing information regarding R.D.'s contract to YARON LEVIN and LIAT LEVIN at GOLDEN HAND.

62. Just before midnight on October 2, 2010, defendant FRANCISCO GUEVARA caused R.D. to sign an incomplete Bill of Lading.  Defendant FRANCISCO GUEVARA inflated the cost of packing material and services by $260.00.

63. Defendant FRANCISCO GUEVARA, acting upon instructions given by YARON LEVIN and LIAT LEVIN, caused R.D. to sign additional incomplete shipping documents.  One of the documents R.D. was directed to sign was entitled "Revised Written Estimate", indicating that R.D. was moving more items or weight than was first anticipated and changed the non-binding agreement into a binding agreement.

64. On or about October 3, 2010, YARON LEVIN telephoned R.D. to inform him that his original non-binding contract with R&C RELOCATION for a move from Colorado to

Nevada at a rate of $1,340 was now void because the volume or weight of goods was greater than anticipated. YARON LEVIN converted the original non-binding agreement into a binding agreement worth $7,646.60—an increase of 570%.

65. From October 3, 2010, until September 14, 2011, YARON LEVIN refused to release household goods belonging to R.D. and continued to increase overall the cost of the move through compounded storage fees, late payment fees, and other charges.

66. From approximately October 3, 2010, until at least September 14, 2011, defendant YARON LEVIN made repeated threats to cause harm to R.D.'s property; specifically, YARON LEVIN made telephonic threats to R.D. by claiming that he was about to sell the property at auction, if he did not immediately pay the inflated costs.

67. On September 14, 2011, R.D. received a telephone call from YARON LEVIN advising him that he sold all of his household goods. YARON LEVIN added that R.D. could buy his goods back for $4,000, but R.D. has never received his household goods.

## <u>Victim 4 – K.C. – (California to North Carolina)</u>

68. NEIGHBORS VAN LINES, acting at the direction of GOLDEN HAND, sent a facsimile message containing information regarding K.C's contract to YARON LEVIN and LIAT LEVIN at GOLDEN HAND.

69. On or about June 22, 2010, employees of AFFORDABLE MOVING AND STORAGE, acting under the direction of defendants YARON LEVIN and LITA LEVIN, contacted K.C. to request that they pick up his household goods a day early.

70. On or about June 24, 2010, GOLDEN HAND employee "Simon", acting under the direction of defendants YARON LEVIN and LIAT LEVIN, contacted K.C. to advise him that he had to sign a "Revised Written Estimate" in order for GOLDEN HAND to ship his household goods.  K.C. refused to sign the "Revised Written Estimate."  GOLDEN HAND later produced a copy of the "Revised Written Estimate" with a signature falsely purported to be that of K.C.

71. On or about July, 23, 2010, YARON LEVIN telephoned K.C. to inform him that his original non-binding contract with NEIGHBORS VAN LINES for a move from California to North Carolina at a rate of $8,967.50 was now void because

31

the volume or weight of goods was greater than anticipated. LEVIN converted the original non-binding agreement into a binding agreement worth $9,214.60—an increase of 102%.

72. During the July 23, 2010 telephone call, K.C. reminded YARON LEVIN that his contract was with NEIGHBORS and that he understood that he would have to pay $7,298 for the move. To that, defendant YARON LEVIN told K.C., "I do not care what is written there. I only want cash money and you need to wire it to my bank in New York. If you do not pay me, I will have the driver put your stuff in storage and you will have to deal with that."

73. On or about July 31, 2010, upon delivery of K.C.'s household goods, defendant YARON LEVIN produced a copy of the "Revision of Estimate" form with K.C.'s signature.

74. The "Revised Written Estimate" indicated that K.C. was moving more items or weight than was first anticipated and changed the non-binding agreement into a binding agreement.

75. As a result of YARON LEVIN's demands, on or about July 31, 2010, K.C. paid defendant YARON LEVIN $9,214.60 by U.S. Postal money order to have his household goods

unloaded from the GOLDEN HAND truck.

### Victim 5 - R.B. (Florida to California)

76.  On or about June 2, 2010, NEIGHBORS VAN LINES, acting under the direction of GOLDEN HAND, sent a facsimile message containing information regarding R.B.'s contract to YARON LEVIN and LIAT LEVIN at GOLDEN HAND.

77.  On or about June 22, 2010, defendant YARON LEVIN caused R.B. to sign an incomplete Bill of Lading. Defendant YARON LEVIN inflated the cost of packing material and services by $11,735.50.

78.  Defendant YARON LIAT LEVIN caused R.B. to sign additional incomplete shipping documents.  One of the documents the relative was directed to sign was entitled "Revised Written Estimate", indicating that R.B. was moving more items or weight than was first anticipated and changed the non-binding agreement into a binding agreement.

79.  On or about June 29, 2010, YARON LEVIN sent an electronic facsimile message to R.B. informing him that his original non-binding contract with NEIGHBORS VAN LINES for a move from Florida to California at a rate of $7,200 was now void because the volume or weight of goods was greater

than anticipated.   YARON LEVIN converted the original non-binding agreement into a binding agreement worth $25,301.33—an increase of 351%.

80.  In his facsimile message to R.B., defendant YARON LEVIN provided a breakdown of the costs, including a 29% fuel surcharge and $11,735 for packing and labor.

81.  Defendant YARON LEVIN contacted R.B. by telephone demanding immediate payment and indicated that if R.B. did not pay, R.B.'s household goods would be sold at auction.

82.  Between July 29, 2010 and August 23, 2010, defendant YARON LEVIN called R.B. by telephone numerous times demanding immediate payment for the move.

83.  On or about August 23, 2010, defendant YARON LEVIN arrived unexpectedly at R.B.'s residence.  During the conversation, LEVIN told R.B. that he would accept $8,000 in cash to release his household goods.  Upon learning that R.B. did not have the money right away, YARON LEVIN asked R.B. what it was like not having his furniture.   In a subsequent telephone call on the following day, defendant YARON LEVIN and an employee of AFFORDABLE MOVING told R.B. that if they were not paid immediately, it would cost

$30,000 and ten years to receive his household goods.

### Victim 6 – K.F. (Colorado to North Carolina)

84.  On June 4, 2011, defendant FRANCISCO GUEVARA caused K.F. to sign two incomplete Bills of Lading. Defendant FRANCISCO GUEVARA inflated the cost of packing material and services by $216.00.

85.  Defendant FRANCISCO GUEVARA, acting upon instructions given by defendants YARON LEVIN and LIAT LEVIN, caused K.F. to sign additional incomplete shipping documents.  Two of the documents K.F. was directed to sign were entitled "Revised Written Estimate", indicating that K.F. was moving more items or weight than was first anticipated and changed the non-binding agreements into binding agreements.

86.  Between June 4, 2011 and June 10, 2011, defendants YARON LEVIN and LIAT LEVIN refused to disclose the actual cost of the move to K.F.

87.  On or about June 10, 2011, YARON LEVIN sent an electronic message ("e-mail") to K.F. to inform her that her original non-binding contracts with WORLDWIDE VAN LINES

35

for moves from Colorado to Michigan and North Carolina at
rates of $1,500 and $2,420 respectively were now void
because the volume or weight of goods was greater than
anticipated.    YARON LEVIN converted the original non-
binding agreement into a binding agreement worth $10,500—an
increase of 267%.

88.  At about 4:30 P.M. on August 3, 2011, defendant
YARON LEVIN called K.F. to tell her that he would be
delivering her household goods that night and that she
needed to have $10,500 in cash immediately available to pay
for delivery.

89.  On or about August 4, 2011, defendant YARON LEVIN
demanded $11,200 to deliver K.F.'s household goods.

### Victim 7 – K.D. (Tennessee to Colorado)

90.  On or about August 6, 2011, Customer Victim "K.D."
was quoted a cost of $0.59 per pound by defendant YARON
LEVIN to move her household goods from Tennessee to
Colorado.  YARON LEVIN did not provide a written estimate
to K.D.

91.  On or about August 6, 2011, K.D., acting upon
demands made by YARON LEVIN, made a payment of $1,500 to

defendant MOVERS USA.

92.  On August 12, 2011, defendant JOHN ALLEN DARBY, acting upon instructions given by defendants YARON LEVIN and LIAT LEVIN, caused K.D. to sign an incomplete Bill of Lading.  Defendant JOHN ALLEN DARBY inflated the cost of packing material and services by $1,534.

93.  On or about August 16, 2011, defendant YARON LEVIN demanded an additional payment of $7,424 for the transportation of K.D.'s household goods.

### Victim 8 – K.Z. (Pennsylvania to Nevada)

94.  On or about June 19, 2010, NEIGHBORS VAN LINES, acting upon the instructions of MOVERS USA, sent an electronic message ("e-mail") containing information regarding K.Z.'s contract to YARON LEVIN and LIAT LEVIN at MOVERS USA.

95.  On or about June 27, 2011, defendant YARON LEVIN caused K.Z. to sign an incomplete Bill of Lading. Defendant YARON LEVIN inflated the cost of packing material and services by $987.00.

96.  Defendant YARON LEVIN caused K.Z. to sign additional incomplete shipping documents.  One of the

documents K.Z. was directed to sign was entitled "Revised Written Estimate", indicating that K.Z. was moving more items or weight than was first anticipated and changed the non-binding agreement into a binding agreement.

97. On or about June 28, 2010, YARON LEVIN telephoned K.Z. to inform him that his original non-binding contract with NEIGHBORS VAN LINES for a move from Pennsylvania to Nevada at a rate of $7,644.78 was now void because the volume or weight of goods was greater than anticipated. YARON LEVIN converted the original non-binding agreement into a binding agreement worth $18,444.92—an increase of 241%.

98. On or about January 6, 2011, YARON LEVIN demanded an additional cash payment of $4,364 to have K.Z.'s goods moved to Nevada.

**Victim 9 – E.P. (Colorado to the District of Columbia)**

99. On or about August 3, 2010, WORLDWIDE VAN LINES, acting on the direction of MOVERS USA, sent a facsimile message containing information regarding E.P.'s contract to YARON LEVIN and LIAT LEVIN at MOVERS USA.

100. On or about August 6, 2010, defendant FRANCISCO

38

GUEVARA, acting under the direction of YARON LEVIN and LIAT LEVIN, caused E.P. to sign an incomplete Bill of Lading.

101. Defendant FRANCISCO GUEVARA caused E.P. to sign additional incomplete shipping documents.  One of the documents E.P. was directed to sign was entitled "Revised Written Estimate", indicating that E.P. was moving more items or weight than was first anticipated and changed the non-binding agreement into a binding agreement.

102. On or about August 9, 2010, YARON LEVIN telephoned E.P. to inform him that his original non-binding contract with WORLDWIDE VAN LINES for a move from Colorado to the District of Columbia at a rate of $1,687.89 was now void because the volume or weight of goods was greater than anticipated.   YARON LEVIN converted the original non-binding agreement into a binding agreement worth $2,769.80—an increase of 164%.

103. On or about August 20, 2010, YARON LEVIN demanded an additional electronic (credit card) payment of $1,812.30 to have E.P.'s goods moved to the District of Columbia.

## Victim 10 – K.K. (Colorado to Utah)

104. On or about August 19, 2011, defendant FRANCISCO GUEVARA, acting under the direction of defendants YARON LEVIN and LIAT LEVIN, caused K.K. to sign an incomplete bill of lading.  Defendant FRANCISCO GUEVARA inflated the cost of packing material and services by $1,071.

105. Defendant FANCISCO GUEVARA caused K.K. to sign additional incomplete shipping documents.  One of the documents K.K. was directed to sign was entitled "Revised Written Estimate", indicating that K.K. was moving more items or weight than was first anticipated and changed the non-binding agreement into a binding agreement.

106. On or about August 19, 2011, defendant FRANCISCO GUEVARA altered the date on a previously obtained weight ticket and used this falsified weight ticket as proof of the empty weight of the moving van used to carry K.K.'s household goods.  This falsified weight ticket was used to calculate the weight of the shipment and the overall cost of the move.  The falsified weight was incorporated into the final bill of lading.

107. On or about August 19, 2011, YARON LEVIN demanded an electronic credit card payment of $2,500.25.

40

108. On or about August 22, 2011, YARON LEVIN demanded another $3,000 electronic credit card payment to have K.K.'s goods moved to Utah.

109. On or about August 27, 2011, defendant JOHN ALLEN DARBY arrived at K.K.'s new residence to deliver his household goods. JOHN ALLEN DARBY demanded an additional cash payment of $1,932.45 before he would open the doors of the truck to begin unloading K.K.'s goods.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS 2 THROUGH 32 - Wire Fraud; Aiding and Abetting

Paragraphs 1 through 24 of the Introduction and paragraphs 25 through 121 of Count 1 are realleged and incorporated as though fully set forth herein.

## SCHEME

It was the object of the scheme, and in furtherance of said scheme, the defendants intended to unjustly enrich

41

themselves by luring customers into doing business with

MOVERS USA/GOLDEN HAND by offering extremely low moving

estimates, taking possession of customers' household goods

and then increasing the price of the MOVERS USA/GOLDEN HAND

transportation of the customers' household goods, and,

thereafter, withholding delivery of their household goods

until the customers paid the fraudulently inflated price to

MOVERS USA, as described in paragraphs 1 through 121 above.


## USE OF THE WIRES

On or about the dates listed in the separate counts below,

in the State and District of Colorado and elsewhere, the

defendants, YARON LEVIN, LIAT LEVIN, FRANCISCO GUEVARA, and

JOHN ALLEN DARBY, having devised the scheme described above

to obtain money and property by means of materially false

and fraudulent pretenses, representations, and promises to

the customer victims, knowingly and willfully transmitted

and caused to be transmitted in interstate commerce by means

of wire communications, certain writings, signs, signals and

sounds, for the purpose of executing such a scheme, as more

specifically described below:

42

| COUNT | FROM | TO | DATE | VICTIM | DESCRIPTION OF THE WIRE COMMUNICATION |
|---|---|---|---|---|---|
| 2 | Woodland Park, CO | Delray Beach, FL | 05/17/2010 | K.F. | K.F. made an electronic credit card payment of $1020 to WORLDWIDE VAN LINES via telephone. |
| 3 | Delray Beach, FL | Denver, CO | 06/23/2010 | K.Z. | NEIGHBORS MOVING AND STORAGE sent an e-mail to GOLDEN HAND regarding the details of K.Z.'s move from Pennsylvania to Nevada. |
| 4 | Denver, CO | Williamston, NC | 08/03/2010 | K.F. | Defendant YARON LEVIN called by telephone K.F. to tell her that the cost of her move was now $10,500. |
| 5 | Denver, CO | Omaha, NE | 08/20/2010 | E.P. | MOVERS USA in Colorado processed an electronic credit card payment of $1,812.30 through the FirstData processing center in Nebraska. |
| 6 | Denver, CO | Omaha, NE | 08/26/2010 | E.P. | MOVERS USA in Colorado processed an electronic credit card payment of $776.70 through the FirstData processing center in Nebraska. |
| 7 | Denver, CO | Henderson, NV | 10/30/2010 | R.D. | Defendant YARON LEVIN called R.D. by telephone to tell him that the cost of his move was now $7,646.60. |

| COUNT | FROM | TO | DATE | VICTIM | DESCRIPTION OF THE WIRE COMMUNICATION |
|---|---|---|---|---|---|
| 8 | Denver, CO | Omaha, NE | 03/26/2011 | G.B. | MOVERS USA in Colorado processed an electronic credit card payment of $300 through the FirstData processing center in Nebraska. |
| 9 | Denver, CO | Omaha, NE | 04/01/2011 | S.E. | MOVERS USA in Colorado processed an electronic credit card payment of $1,500 through the FirstData processing center in Nebraska. |
| 10 | Denver, CO | Omaha, NE | 04/10/2011 | S.E. | MOVERS USA in Colorado processed an electronic credit card payment of $6,231.10 through the FirstData processing center in Nebraska. |
| 11 | Denver, CO | Omaha, NE | 04/14/2011 | S.E. | MOVERS USA in Colorado processed an electronic credit card payment of $212.08 through the FirstData processing center in Nebraska. |
| 12 | Denver, CO | Omaha, NE | 04/29/2011 | P.G. | MOVERS USA in Colorado processed an electronic credit card payment of $1,200 through the FirstData processing center in Nebraska. |

| COUNT | FROM | TO | DATE | VICTIM | DESCRIPTION OF THE WIRE COMMUNICATION |
|---|---|---|---|---|---|
| 13 | Denver, CO | Omaha, NE | 05/04/2011 | P.G. | MOVERS USA in Colorado processed an electronic credit card payment of $3,169.31 through the FirstData processing center in Nebraska. |
| 14 | Denver, CO | Omaha, NE | 05/25/2011 | D.P. | MOVERS USA in Colorado processed an electronic credit card payment of $2,500 through the FirstData processing center in Nebraska. |
| 15 | Denver, CO | Omaha, NE | 05/29/2011 | G.B. | MOVERS USA in Colorado processed an electronic credit card payment of $10,931.89 through the FirstData processing center in Nebraska. |
| 16 | Denver, CO | Omaha, NE | 06/02/2011 | T.K. | MOVERS USA in Colorado processed an electronic credit card payment of $6,243.86 through the FirstData processing center in Nebraska. |
| 17 | Denver, CO | Omaha, NE | 06/10/2011 | R.S. | MOVERS USA in Colorado processed an electronic credit card payment of $235.26 through the FirstData processing center in Nebraska. |

| COUNT | FROM | TO | DATE | VICTIM | DESCRIPTION OF THE WIRE COMMUNICATION |
|---|---|---|---|---|---|
| 18 | Denver, CO | Omaha, NE | 06/14/2011 | J.G. | MOVERS USA in Colorado processed an electronic credit card payment of $1,000 through the FirstData processing center in Nebraska. |
| 19 | Denver, CO | Omaha, NE | 06/23/2011 | J.G. | MOVERS USA in Colorado processed an electronic credit card payment of $1,645 through the FirstData processing center in Nebraska. |
| 20 | Aurora, CO | Delray Beach, FL | 07/15/2011 | V.S. | V.S. made and electronic payment via telephone of $775.95 to WORLDWIDE VAN LINES. |
| 21 | Denver, CO | Omaha, NE | 07/16/2011 | C.W. | MOVERS USA in Colorado processed an electronic credit card payment of $500 through the FirstData processing center in Nebraska. |
| 22 | Delray Beach, FL | Denver, CO | 07/19/2011 | V.S. | WORLDWIDE VAN LINES sent a facsimile via telephone containing details of V.S.'s contract estimate to defendants YARON LEVIN and LIAT LEVIN. |
| 23 | Denver, CO | Portsmouth, VA | 08/03/2011 | V.S. | Defendant YARON LEVIN called V.S. by telephone to tell her that the cost of her move was now $9,480.42. |

| COUNT | FROM | TO | DATE | VICTIM | DESCRIPTION OF THE WIRE COMMUNICATION |
|---|---|---|---|---|---|
| 24 | Denver, CO | Portsmouth, VA | 08/04/2011 | V.S. | Defendant YARON LEVIN sent facsimile copies of a Bill of Lading to V.S. via telephone. |
| 25 | Denver, CO | Portsmouth, VA | 08/04/2011 | V.S. | Defendant YARON LEVIN called V.S. by telephone to tell her that her previous contract was no longer valid and that he had no intention of delivering her goods to Virginia. |
| 26 | Denver, CO | Portsmouth, VA | 08/07/2011 | V.S. | Defendant YARON LEVIN sent an e-mail message outlining the details of "Plan B" to "release" V.S.' household goods to her in Denver if she pays MOVERS USA $4465. |
| 27 | Delray Beach, FL | Denver, CO | 08/09/2011 | W.B. | WORLDWIDE VAN LINES sent a facsimile via telephone containing details of V.S.'s contract to defendants YARON LEVIN and LIAT LEVIN. |
| 28 | Denver, CO | Omaha, NE | 08/19/2011 | K.K. | MOVERS USA in Colorado processed an electronic credit card payment of $3,000 through the FirstData processing center in Nebraska. |

| COUNT | FROM | TO | DATE | VICTIM | DESCRIPTION OF THE WIRE COMMUNICATION |
|-------|------|----|----|--------|----------------------------------------|
| 29 | Denver, CO | Omaha, NE | 08/22/2011 | K.K. | MOVERS USA in Colorado processed an electronic credit card payment of $2,500.25 through the FirstData processing center in Nebraska. |
| 30 | Denver, CO | Omaha, NE | 08/24/2011 | W.B. | W.B. paid MOVERS USA $3,600 by electronic credit card transaction. |
| 31 | Denver, CO | Henderson, NV | 09/14/2011 | R.D. | Defendant YARON LEVIN called R.D. by telephone to advise him that his goods had been sold, but that he could buy them back for $4,000. |
| 32 | Denver, CO | Portsmouth, VA | 09/21/2011 | V.S. | Defendant YARON LEVIN sent an e-mail message to V.S. demanding payment by 10/21/2011 or MOVERS USA will sell her household goods. |

All in violation of Title 18, United States Code, Sections 1343 and 2.

### COUNTS 33 through 39 - Extortion; Aiding and Abetting

Paragraphs 1 through 24 of the Introductory Allegations section and paragraphs 25 through 121 of Count One are realleged and incorporated as though fully set forth herein.

On or about the dates set forth below, in the State and District of Colorado and elsewhere, the defendants, listed to each count below, knowingly, willfully, and unlawfully obstructed, delayed, and affected, and attempted to obstruct, delay, and affect interstate commerce and the movement of any article in commerce by means of extortion, by demanding and receiving money for moving services from customers, said customers' consent having been induced by the defendants' wrongful use of fear of economic harm, in that, defendants threatened to withhold delivery of customers' household goods unless they paid the money that the defendants falsely claimed they were owed.

| Count | Date | Defendant | Details |
|---|---|---|---|
| 33 | 8/23/2010 | YARON LEVIN | Defendant threatened to withhold delivery of R.B.'s goods unless he immediately paid the amount MOVERS USA claimed it was owed.  Defendant also threatened to increase the overall cost of the move to $30,000 and add ten years to the delivery date if YARON LEVIN did not receive immediate payment. |

| Count | Date | Defendant | Details |
|-------|------|-----------|---------|
| 34 | 8/4/2011 | YARON LEVIN | Defendant threatened to withhold delivery of V.S.'s goods unless she immediately paid the amount MOVERS USA claimed it was owed. |
| 35 | 8/29/2011 | YARON LEVIN | Defendant, while physically holding W.B. by the throat, withheld delivery of W.B's goods until YARON LEVIN received the amount of money MOVERS USA claimed it was owed. |
| 36 | 10/30/2010 through 09/14/2011 | YARON LEVIN | Defendant threatened to withhold delivery of R.D.'s goods until YARON LEVIN received the amount of money GOLDEN HAND/MOVERS USA claimed it was owed. |
| 37 | 11/18/2011 | YARON LEVIN | Defendant threatened to withhold delivery of K.C.'s goods unless he participated in a telephone call, provided false information to investigators, and removed internet website content unfavorable to GOLDEN HAND/MOVERS USA. |
| 38 | 08/03/2011 | YARON LEVIN | Defendant threatened to withhold delivery of K.F.'s goods until he received the amount of money GOLDEN HAND/MOVERS USA claimed it was owed. |
| 39 | 08/27/2011 | JOHN ALLEN DARBY | Defendant threatened to withhold delivery of K.K.'s goods until he received the amount of money GOLDEN HAND/MOVERS USA claimed it was owed. |

All in violation of Title 18, United States Code, Sections 1951 and 2.

## Counts 40 through 54 - Falsely Making a Bill of Lading; Aiding and Abetting

Paragraphs 1 through 24 of the Introduction section and paragraphs 25 through 121 of Count 1, and the factual allegation paragraphs contained Counts 2 through 39 are realleged and incorporated as though fully set forth herein.

110. On or about the dates set forth below, in the State and District of Colorado and elsewhere, the defendants YARON LEVIN, FRANCISCO GUEVARA, and JOHN ALLEN DARBY knowingly and with intent to defraud customers, falsely made bills of lading that were blank or incomplete and/or contained fraudulently inflated prices for the customers' moves:

| Count | Date | Victim | Details |
|-------|------|--------|---------|
| 40 | 04/01/2011 | S.E. | Move from Aurora, CO to Worcester, MA – the calculated weight based upon a false weight ticket |
| 41 | 04/29/2011 | P.G. | Move from Dacono, CO to Newport News, VA – the calculated weight based upon a false weight ticket |

51

| Count | Date | Victim | Details |
|---|---|---|---|
| 42 | 05/24/2011 | D.P. | Move from Littleton, CO to Deerfield Beach, FL – the calculated weight based upon a false weight ticket |
| 43 | 05/27/2011 | G.B. | Move from Littleton, CO to Brookfield, IL – the calculated weight based upon a false weight ticket |
| 44 | 05/28/2011 | R.S. | Move from Denver, CO to Cohecton, NY – the calculated weight based upon a false weight ticket |
| 45 | 05/31/2011 | M.B. | Move from Kenosha, WI to Havertown, PA – the calculated weight based upon a false weight ticket |
| 46 | 06/01/2011 | T.K. | Move from Grand Junction, CO to Scranton, PA - the calculated weight based upon a false weight ticket |
| 47 | 06/11/2011 | J.G. | Move from Colorado Springs, CO to Lansing, MI – the calculated weight based upon a false weight ticket |
| 48 | 06/19/2011 | C.M. | Move from Denver, CO to Los Angeles, CA – the calculated weight based upon a false weight ticket |
| 49 | 07/06/2011 | C.L. | Move from Colorado Springs, CO to Olympia, WA – the calculated weight based upon a false weight ticket |
| 50 | 07/08/2011 | A.A. | Move from Englewood, CO to Charlotte, NC – the calculated weight based upon a false weight ticket |
| 51 | 07/16/2011 | C.W. | Move from Denver, CO to Marion, IA – the calculated weight based upon a false weight ticket |

| Count | Date | Victim | Details |
|-------|------|--------|---------|
| 52 | 08/02/2011 | V.S. | Move from Aurora, CO to Portsmouth, VA – the calculated weight based upon a false weight ticket |
| 53 | 08/19/2011 | K.K. | Move from Littleton, CO to Springville, UT – the calculated weight based upon a false weight ticket |
| 54 | 08/22/2011 | W.B. | Move from Colorado Springs, CO to Paducah, KY – the calculated weight based upon a false weight ticket |

All in violation of 49 U.S.C. § 80116 and 18 U.S.C. § 2.


## Count 55 - Theft from Interstate Shipment

Paragraphs 1 through 24 of the Introductory Allegations section and paragraphs 25 through 121 of Count 1, and the factual allegations contained in Counts 2 through 54 are realleged and incorporated as though fully set forth herein.

On or about the dates set forth below, in the State and District of Colorado and elsewhere, the defendants, YARON LEVIN and LIAT LEVIN from any motortruck, trailer, or other vehicle, or from any storage facility, warehouse, or storage consolidation facility, with intent to convert to their own

53

use, goods which were part of an interstate shipment of freight, to wit:  the defendants YARON LEVIN and LIAT LEVIN knowingly stole, and unlawfully took, carried away, and obtained by fraud and deception a motorized wheelchair, stepladder, a hand cart, a Dell office computer, two suitcases, a cabinet, and a business desk, all with a value exceeding $1,000.

All in Violation of Title 18, United States Code, Sections 659 and 2.

### FORFEITURE ALLEGATION (18 U.S.C. § 981(a)(a)(c) and 28 U.S.C. § 2461(c) – Forfeiture of Wire Fraud and Extortion Proceeds)

Paragraphs 1 through 24 of the Introductory Allegations section and paragraphs 25 through 121 of Count 1, and the factual allegations contained in Counts 2 through 55 are realleged and by this reference fully incorporated herein for the purpose of alleging forfeiture pursuant to the provisions of 18 U.S.C. § 981(a)(1)(c) and 28 U.S.C. § 2461(c).

Upon Conviction of any of the offenses alleged in Counts 1 through 41, the defendants, YARON LEVIN, LIAT LEVIN, FRANCISCO GUEVARA, and JOHN ALLEN DARBY shall forfeit to the United States all property, real or personal, which constitutes and is derived from proceeds traceable to said offenses.

If, as a result of any act or omission of the defendants, any of said property cannot be located upon the exercise of due diligence; has been transferred or sold to or deposited with, a third person; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty; any and all interest defendants have in any other property, up to a value of the property described above, shall be forfeited to the United States as incorporated by Rule 32.2 of the Federal Rules of Criminal Procedure.

A TRUE BILL:


Ink signature on file in the Clerk's Office
FOREPERSON


JOHN F. WALSH
United States Attorney


  s/Joseph Mackey
By: JOSEPH MACKEY
Assistant United States Attorney
United States Attorney's Office
1225 Seventeenth Street, Suite 700
Denver, Colorado 80202
Telephone: 303-454-0100
Facsimile: 303-454-0403
E-mail: Joseph.Mackey@usdoj.gov